UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


JESSE CAMACHO,                    )
                                 )
              Petitioner,         )
     v.                          )          CIVIL ACTION
                                 )          NO. 16-11826-RGS
MICHAEL ZENK,                     )
                                 )
              Respondent.         )


## REPORT AND RECOMMENDATION ON PETITION FOR
## WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

August 12, 2019

DEIN, U.S.M.J.

### I.  INTRODUCTION

The petitioner, Jesse Camacho ("Camacho" or the "defendant"), was convicted of first

degree murder on theories of deliberate premeditation and extreme atrocity and cruelty (and

related charges) in the shooting death of Jeffrey Santiago and wounding of others at King

Arthur's Lounge (the "club") in Chelsea, Massachusetts, in the early morning of January 24,

2008.[1]  The identity of the shooter was not at issue.  Rather, Camacho's defense was that he

acted in defense of others — a theory which the Suffolk County jury rejected.  Following his

conviction, Camacho sought additional discovery which he claimed had been wrongfully with-

---

[1] On June 29, 2010, a Suffolk County jury convicted Camacho of first-degree murder, carrying a firearm without a license, two counts of armed assault with intent to murder, and two counts of assault and battery with a dangerous weapon.  SA 2-3.  He was sentenced to life imprisonment without the possibility of parole on the murder conviction, a concurrent term of 4-5 years on the firearm conviction, and consecutive terms of 10-12 years on each of the assault convictions, which were later modified to run concurrently with each other.  SA 11-13.  The assault and battery convictions were each placed on file. Id.

held relating to the alleged gang affiliation of the victim and some of his friends, and sought a new trial on the grounds of ineffective assistance of counsel in connection with his lawyer's alleged failure to review relevant evidence and his consequent decision not to recommend that Camacho agree to plead to second degree murder.  The trial judge denied the motion for discovery and, after an evidentiary hearing on the issue of ineffective assistance of counsel, at which the prosecutor and defense counsel both testified, denied the (amended) motion for a new trial as well.  In a consolidated appeal, the Massachusetts Supreme Judicial Court ("SJC") affirmed Camacho's conviction and the denial of the post-trial motions.  The SJC further declined to exercise its discretion under Mass. Gen. Laws ch. 278, § 33E to reduce the murder verdict to a lesser degree of guilt, or to order a new trial.  Commonwealth v. Camacho, 472 Mass. 587, 36 N.E.3d 533 (2015).  This timely habeas petition followed.

In this habeas petition brought pursuant to 28 U.S.C. § 2254, Camacho contends that his rights under the Fifth and Sixth Amendment of the United States Constitution were violated because (1) the trial judge improperly precluded him from introducing evidence related to the violent criminal pasts and alleged gang affiliations of the victim and his companions after the Commonwealth allegedly failed to disclose information that they were all associated with the gang known as the Bloods, and (2) the trial counsel rendered ineffective assistance in advising Camacho to reject a plea to second degree murder without reviewing in a timely manner video discovery the Commonwealth had provided.  These issues were exhausted below and rejected by the trial judge and the SJC.

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Camacho's habeas petition be DENIED.  The SJC's rulings are not based

[2]

on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, nor are they an unreasonable application of or contrary to clearly established law as defined by the United States Supreme Court.

## II. STATEMENT OF FACTS[2]

### The Underlying Crime

This habeas petition arises out of events that occurred at King Arthur's Lounge in the early morning hours of January 24, 2008. As the SJC described the facts, in the light most favorable to the Commonwealth,[3] on that night the victim, Jeffrey Santiago, went to the club with his friends Toulou Thach and Gabriel Rodriguez, where they met up with Edward Vozzella and Kevin Reis. Camacho, 472 Mass. at 589, 36 N.E.3d at 537. Camacho also went to the club that night with his friend Mario Sunsin, and they met up with Marcelo Miranda and his friends Danny Diaz and another man. Id. The evidence was that Camacho, Sunsin and Miranda were members of the Tiny Rascals Gang ("TRG"). Id. There was also evidence that the victim's friend, Rodriguez, was a member of a rival gang, the Bloods. Id. As discussed below, Camacho contends that the Commonwealth withheld evidence that the victim and his other companions were also Bloods, which the Commonwealth denies. In any event, the jury heard that TRG had had problems with the Bloods in the past, and that "Sunsin and Miranda were familiar with

---

[2] The record below is found in various filings by the Respondent, including the Supplemental Answer ("SA") containing various pleadings (Docket No. 13); the two volume Record Appendix ("RA") containing various pleadings (Vol. I) and excerpts from transcripts (Vol. II) (Docket No. 21); and sealed excerpts of Grand Jury testimony ("GJ") (Docket No. 25).

[3] As detailed infra, the state court's findings of fact are presumed to be correct unless there is "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002).

Rodriguez, as Rodriguez and Miranda had previously been in a fight that resulted in Miranda's hospitalization.  More recently, Sunsin and Miranda had thrown Rodriguez out of a hotel room, forcing him to walk home in the cold in his underwear."  Id.

It was undisputed at trial that Rodriguez instigated the melee.  As the SJC described the evidence:

> On Miranda's arrival at the club earlier that night, he saw Rodriguez and asked him if there was going to be any trouble. Rodriguez replied, "No." Diaz testified that he had had a confrontation at the door of the club with a man he later identified as the victim.  Eventually, the defendant and his group sat down to watch the club's dancers perform, while members of the victim's group congregated by the bar.  At this point, the victim wandered toward the club's stage and stood against a wall behind the defendant, conversing with a bouncer and watching the dancers.
>
> Subsequently, the victim's group left the bar area and came over to stand behind the defendant and his group of friends.  The victim conversed with his friends for a few moments before moving away from them towards the dancers' entrance to the stage.  Meanwhile, Rodriguez sat down next to Miranda, and the two conversed for a few minutes before Rodriguez went back to his group of friends.  Miranda told the defendant's group to keep their heads up because "something could happen."  Almost immediately after Rodriguez left the seat next to Miranda, Rodriguez threw a beer bottle at Sunsin's head.[2]  Sunsin then tackled Rodriguez, the two men fell to the ground, and some of the victim's group jumped on top of Sunsin and started to hit him.
>
> > [2] Mario Sunsin testified that the bottle hit him in the head, but there was conflicting evidence from at least one witness as to whether the bottle actually hit him.
>
> As Sunsin tackled Rodriguez, the defendant jumped up from his seat, took out a firearm, "rack[ed]" it, and started firing at the victim's group.  While the victim, Vozzella, and Joseph Upton (a bouncer) were attempting to flee from the gunfire, shots struck them.[3] The victim subsequently fell to the ground.  As the defendant chased the fleeing group out of the club, he approached the victim, who remained lying on the floor, and shot him two more times from less than two feet away.[4] The defendant then left the bar, attempting to shoot others as they ran.  He fled Massachusetts days after the shooting and was apprehended in Mexico nine months later.

[4]

[3] Sunsin may also have been hit by the defendant's gunfire.

[4] The medical examiner testified that these two gunshot wounds to the victim's chest were fatal.

Id. at 589-90, 36 N.E.3d at 537-38.

### Testimony of Danny Diaz

It was the defendant's contention that he shot in defense of his friend Sunsin who was being attacked. Id. at 592, 36 N.E.3d at 539. The Commonwealth contended that Camacho shot Santiago with extreme atrocity and cruelty by deliberately shooting him while he was already lying on the ground, having previously been wounded by Camacho, and at a time when Santiago was fleeing from the shooting and was not otherwise involved in the melee. Id. at 607-08, 36 N.E.3d at 550-51; SA 19. Evidence of this deliberate act came from the tape from the surveillance camera and the testimony of Danny Diaz, who was the only eyewitness to the shooting. Camacho, 472 Mass. at 604-05, 36 N.E.3d at 548-49; see also RA II at 809-10, 825-26.

On the night of the shooting, Diaz gave a videotaped interview with the police at which he described the events in question. Camacho, 472 Mass. at 605, 36 N.E.3d at 549. Although the videotape was produced by the Commonwealth in discovery, defense counsel did not view it until the night before Diaz's cross-examination. Id. As discussed more fully below, counsel's failure to view the videotape earlier in the litigation is part of Camacho's claim of ineffective assistance of counsel. Diaz also testified at the grand jury, consistent with his statement to the police. Id. & n.22. Defense counsel did review the grand jury testimony prior to trial. Id.

Before trial started, Diaz had been charged with drug trafficking and had fled the country. Id. at 605-06 & n.24, 36 N.E.3d at 549 & n.24. He was eventually apprehended, but it

was doubtful whether he could be extradited to Massachusetts in time for trial, and the trial judge denied the parties' request for a continuance.  See id.  Thus, when trial started, Diaz was not available to testify.  It was not until the seventh day of trial that Diaz was returned to the Commonwealth and it was confirmed he would take the stand.  Id. at n.25.  His testimony on the eighth day of trial was consistent with his prior statements.  Id. at 605, 36 N.E. 3d at 549.

Significantly, up until Diaz's testimony, the Commonwealth had offered Camacho a plea to second degree murder, although defense counsel was holding out for a manslaughter plea. After Diaz's testimony, however, the prosecutor became convinced that the evidence was strong enough to support a first degree murder conviction, and that a plea to second degree murder was no longer a viable alternative.  See id. at 606 & n.26, 36 N.E.3d at 549-50 & n.26. As discussed more fully below, Camacho claims that defense counsel's failure to recommend that Camacho accept the offer to plead guilty to second degree murder constituted ineffective assistance of counsel.

### Plea Negotiations[4]

Camacho was represented by Willie Davis at trial, an experienced trial attorney.  SA 19. Attorney Davis testified in connection with Camacho's motion for a new trial based on ineffective assistance of counsel, as did the prosecutor, Assistant District Attorney ("ADA") Patrick Haggan.  See RA II at 479-541.  The evidence established that Attorney Davis continuously requested that the Commonwealth accept a manslaughter plea, even without agreement as to a term of years.  SA 20.  In light of the uncontested fact that Rodriguez was the aggressor when

---

[4] Unless otherwise indicated, these facts are derived from the trial judge's "Memorandum of Decision on Defendant's Amended Motion for New Trial."  SA 18-22.

he attacked Sunsin with a beer bottle, Attorney Davis felt that he had a viable defense to all the charges, namely the defense of another person (i.e., Sunsin).  SA 19.  Alternatively, Attorney Davis was of the opinion that the jury could believe that Camacho used excessive force in connection with his defense of another, and, consequently, return a verdict of manslaughter. SA 19-20.  The prosecutor remained adamant that the only plea the Commonwealth would accept was to second degree murder.  SA 20.  According to the trial judge in his ruling on the motion for a new trial, "central" to the ADA's offer "was the expected evidence from Mr. Diaz, who clearly saw the defendant return to the fray and shoot two bullets into Santiago.  Diaz's evidence was memorialized by the police in a recorded interview shortly after the shooting and in grand jury testimony."  Id.  For his part, Attorney Davis continued to feel that manslaughter was the appropriate disposition, and advised Camacho to reject the offer of a plea to second degree murder.  Id.

As described above, at the outset of the trial, it was far from clear that Diaz, the only eyewitness, would be available to testify or if he would be a favorable witness for the prosecution.  Id.  Diaz was returned to the Commonwealth on the seventh day of trial, and testified on the eighth day.  Id.  According to the prosecutor, he was no longer willing to accept a plea to second degree murder after Diaz testified, as he was convinced that the evidence was strong enough that the jury could return a verdict of first degree murder.  Id.  In the prosecutor's view, Diaz "did an excellent job on the witness stand."  RA II at 516.  Prior to that time, the prosecutor was of the opinion that the jury could come back with a second degree murder or manslaughter conviction.  See RA II at 512, 514, 517-18.  Attorney Davis, on the other hand, continued to believe, even after Diaz's testimony, that manslaughter was the appropriate disposition.  SA 20.

Attorney Davis's opinion changed when, during his closing, the prosecutor made a very persuasive use of still photographs and video from the surveillance camera to argue that Camacho returned, in effect, to execute the victim after the danger from Rodriguez had passed. SA 21; see RA II at 883-92, 899-901 (Commonwealth's closing argument referencing still photographs and surveillance video). While Attorney Davis had viewed the surveillance tape and photographs before, it was only at this point that Attorney Davis recognized the serious risk of a first degree murder conviction.[5] See SA 21. By then, however, it was too late as the Commonwealth would no longer entertain a plea recommendation to second degree murder. Id. Attorney Davis did not express his concerns to the defendant as it would not have done any good. Id.

In denying Camacho's motion for a new trial and claim of ineffective assistance of counsel, the trial judge ruled as follows:

> In this case, Mr. Davis's advice to reject the Commonwealth's offer of a second-degree murder plea bargain was not unreasonable. Here there was no question that the defendant was not the original aggressor, and acted only after Rodriguez's vicious attack with a beer bottle. Present defense counsel now argues that Davis did not give enough predictive weight to the impact of Diaz's testimony and the evidence of the video. But that strikes me as Monday morning quarterbacking. Diaz was, as stated, a problematic witness for the government. It was highly uncertain that he would ever appear; and that, if he did, he would be willing to testify. Hardly a saint, Diaz had a few blots on his escutcheon which Mr. Davis could exploit.
>
> To be sure, the video evidence was always there and available even if Diaz did not testify. In many respects, however, absolute clarity of the video was

---

[5] In his appeal from the denial of his motion for a new trial, Camacho contended that Mr. Davis had failed to view the surveillance footage at all prior to trial. However, that argument appears to have been based on a misunderstanding of a statement made by Mr. Davis during his testimony at the motion for a new trial, and was rejected by the SJC. Camacho, 472 Mass. at 604, 36 N.E.3d at 548. Camacho does not repeat this claim in connection with his habeas petition.

lacking.  I accept, in large part because I was there and heard the final arguments, Mr. Davis's testimony that he did not realize that his defense was in trouble until Mr. Haggan's final argument.  Mr. Davis no doubt anticipated that Mr. Haggan, an experienced prosecutor, would deliver an excellent closing.  There was, however, something powerfully persuasive about the manner in which Mr. Haggan interspersed his oral argument with scenes from the video.  That Mr. Davis did not fully appreciate the strength of the Commonwealth's case until then is understandable.

For these reasons I find and rule that Mr. Davis's plea advice to the defendant did not fall below that which might be expected from an ordinary fallible lawyer.  When his judgment changed about the strength of the Commonwealth's case, it was too late to make any difference to the defendant.  Following final argument, murder in the second degree would not have been on the table.

SA 21-22.

### Discovery Related to Alleged Gang Affiliation

Camacho requested discovery, both before and after trial, to establish that the victim and his associates were gang members.  Such evidence, according to Camacho, could be used to bolster his defense of another claim, and could be used to impeach witnesses for bias.  See Camacho, 472 Mass. at 598-99, 601, 36 N.E.3d at 544, 546.  Camacho did receive some police reports about Rodriguez, Reis and the victim.  Id. at 599 n.14, 36 N.E.3d at 544 n.14.  However, Camacho believes that additional evidence was withheld.  In support of this contention, Camacho cites to two pieces of information.  First, he relies on the following statement made by the prosecutor at the hearing on the motion for a new trial when he was asked to summarize the factual background of the case:

> Although it didn't come out at the trial itself, there was some underlying gang motivation where allegedly the defendant ... and his friends were members of a gang known as TRG, which is an acronym for Tiny Rascals Gang.  **I believe Mr. Gabriel Rodriguez and his friends were more affiliated with the Bloods.**  So there was some bad blood, so to speak, between the

two groups.  There were some prior instances of violence between Mr.
Rodriguez and Mr. Suns[i]n.

Id. at 599 n.15, 36 N.E.3d at 545 n.15 (emphasis added).  Second, he relies on a summary of

the shooting given to the Department of Correction ("DOC") which provided that "[a] verbal

altercation began between friends of [the defendant] and a group of men affiliated with a rival

gang.  This rival group included the deceased victim . . . ."  Id. at 599 n.16, 36 N.E.3d at 545

n.16.

Camacho raised these claims in a motion for post-conviction discovery.  RA I at 112.  In

denying the motion, the trial judge ruled as follows:

> The subject of gang affiliation was the subject of pretrial discovery, and it
> appears that the [Commonwealth] produced most of the materials sought
> by [defendant].  Evidence of gang affiliation was introduced at trial.  The
> [defendant] has not made a prima facie showing sufficient to obtain post trial
> discovery.

Id.

### The SJC Decision[6]

The SJC consolidated Camacho's direct appeal with his appeal from the trial judge's

denial of his motion for a new trial and for post-conviction discovery.  Both issues raised in the

habeas petition – namely, that Camacho was wrongly deprived of obtaining and introducing

evidence that the victim and his associates were associated with the Bloods, and that trial

counsel was ineffective in advising Camacho to reject a plea to second degree murder – were

addressed by the SJC.

---

[6] For the most part, this court will limit its discussion of the SJC decision to those issues which were
raised in Camacho's habeas petition.

**Alleged Gang Affiliation**

As to the defendant's request for evidence of gang affiliation, the SJC applied the

standard set forth by the Supreme Court in Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.

Ed. 2d 215 (1963), requiring the Commonwealth "to disclose favorable evidence that it has in

its possession, which could materially aid the defendant." Camacho, 472 Mass. at 598, 36

N.E.3d at 544.  As an initial matter, the SJC held that "[t]he defendant has failed to make the

necessary showing that he was entitled to postconviction discovery, as he has not demon-

strated sufficiently that other gang-related evidence actually existed." Id. at 600, 36 N.E.3d at

545.  As the SJC explained:

> First, at trial, Sunsin explicitly testified that other than Rodriguez, no rival
> gang members were present on the night of the shooting. Moreover, the
> prosecutor's statement at the new trial hearing was made during a lengthy
> recitation of the case's factual background and corroborates what was
> revealed at trial: the defendant and his friends were gang affiliated and
> Rodriguez was affiliated with a rival gang. His statement that Rodriguez's
> friends were "more affiliated with the Bloods" is not evidence that the victim
> was in fact in a rival gang, but only suggests that the victim was "more
> affiliated" with Rodriguez than he was with the defendant's gang. Although
> the prosecutor definitively stated that the defendant and his friends were
> "members" of a gang, he made no such statement about the victim. Finally,
> the Department of Correction report cannot be attributed to the prosecutor.

Id.

The SJC went on to hold that even "[i]f such gang-related evidence existed, which the

defendant has failed to demonstrate, the Commonwealth was not obligated to search other

law enforcement agencies for it." Id.  Finally, the Court ruled that "even if such evidence did

exist, the defendant has failed to show that it would have materially aided his defense or

factored into the jury's deliberations" since there was no evidence that the defendant knew

that anyone other than Rodriguez was affiliated with the Bloods, so he could not have acted in

response to such information.  Id. at 601, 36 N.E.3d at 546.  Similarly, the SJC concluded the

information could not have been used to impeach any of the government's witnesses since

"none of the testifying witnesses associated with the victim was even asked, much less denied,

whether they or the victim were affiliated with a gang."  Id.  Thus, the SJC determined:

> Based on the record before us, the defendant has not demonstrated
> sufficiently that postconviction discovery would have led to additional
> evidence warranting a new trial.  Without a showing that other gang-related
> evidence actually existed, and that the Commonwealth withheld such
> evidence, we cannot say that it was an abuse of discretion for the judge to
> deny the defendant's motion.

Id.  For the reasons detailed below, the SJC ruling was not based on an unreasonable determi-

nation of the facts.  Nor is it contrary to or an unreasonable application of Supreme Court law.

## Ineffective Assistance of Counsel

The SJC reviewed, and rejected, Camacho's contention that Attorney Davis provided

ineffective assistance of counsel by advising Camacho not to accept the offer of pleading guilty

to second degree murder.  In so doing, the SJC applied the standards defined by the United

States Supreme Court.  As the SJC held:

> To prevail on an ineffective assistance of counsel claim a defendant must
> demonstrate "serious incompetency of counsel (behavior falling measurably
> below that which might be expected from an ordinary fallible lawyer) and
> prejudice that, in this context, means a 'reasonable probability' that 'but for
> counsel's unprofessional errors, the result of the proceeding would have
> been different.'" *Commonwealth v. Mahar,* 442 Mass. 11, 15, 809 N.E.2d 989
> (2004), quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S. Ct. 2052,
> 80 L.Ed.2d 674 (1984). To demonstrate that ineffective assistance of counsel
> caused prejudice in the context of a plea deal, a defendant "must show the
> outcome of the plea process would have been different with competent
> advice." *Lafler v. Cooper,* – U.S. –, 132 S. Ct. 1376, 1384, 182 L.Ed.2d 398
> (2012). Moreover, G.L. c. 278, § 33E, provides a "standard ... that is more
> favorable to a defendant than is the constitutional standard for determining
> ineffectiveness of counsel" (quotation and citation omitted). *Commonwealth
> v. Britto,* 433 Mass. 596, 601–602, 744 N.E.2d 1089 (2001).

[12]

Id. at 604, 36 N.E.3d at 548.

Camacho originally claimed that counsel was ineffective by not reviewing surveillance video footage of the shooting prior to the prosecutor's closing argument.  As stated, supra at n.5, the SJC rejected this argument as not being supported by the record, and Camacho does not repeat it in connection with his habeas petition.  See Camacho, 472 Mass. at 604, 36 N.E.3d at 548.

Camacho next argued that his counsel was ineffective in failing to review Diaz's video statement meaningfully.  Id. at 605, 36 N.E.3d at 549.  The SJC found that "[a]t trial, defense counsel stated that he did not view this statement until the night before Diaz's cross-examination."  Id.  However, the SJC ruled that "[a]lthough defense counsel certainly should have reviewed Diaz's statement in a more timely fashion, any delay was mitigated by the fact that he did view it and was therefore able to adequately prepare and conduct an effective cross-examination."  Id.  The SJC further ruled that given that the video statement was largely consistent with the grand jury testimony that Attorney Davis had reviewed, "it is unlikely that viewing the video any earlier would have altered defense counsel's strategy."  Id.

Camacho's principal argument before the SJC (and in his habeas petition) is "that had defense counsel properly reviewed all the evidence, he would have realized a murder in the first degree conviction was likely and therefore would have advised the defendant to accept the plea deal."  Id.  The SJC rejected that argument and concluded, as had the trial judge, that counsel's advice to reject the offer of a second degree plea bargain was not unreasonable.  As the SJC ruled:

Diaz's testimony was essential to convict the defendant of murder in the first degree, as he was the only person who testified to seeing the defendant shoot the victim twice while the victim lay on the floor.  At the time defense counsel advised the defendant not to accept the Commonwealth's plea deal, it was uncertain whether Diaz (who fled to another country) would testify, and, if so, whether he would cooperate and whether he would be credible.

Id. at 605-606, 36 N.E.3d at 549 (footnote omitted).  The SJC then ruled that:

[O]n the record before us, defense counsel's inability to recognize fully the strength of the Commonwealth's case until after Diaz testified was understandable[25] and his advice to reject the murder in the second degree plea, when it was available,[26] was not ineffective.

[25] The defendant also argues that defense counsel should have advised him to accept the plea deal once it was clear (on the seventh day of trial) that Diaz was going to testify.  However, as previously mentioned, at that point it was still far from obvious that Diaz would be a cooperative witness.  In fact, when ruling on the defendant's motion for a new trial, the judge stated, "Diaz was ... a problematic witness for the govern-ment.  It was highly uncertain that he would ever appear; and that, if he did, he would be willing to testify."

Moreover, at the time Diaz was to testify, he faced a fifteen year mandatory minimum term of imprisonment on charges of drug trafficking.  Defense counsel aggressively cross-examined Diaz on the agreement he had with the district attorney's office with respect to reducing those charges and any prospective sentence.

[26] After Diaz testified, the Commonwealth no longer offered the defendant an option to plead guilty to murder in the second degree.

Id. at 606, 36 N.E.3d at 549-50 (citations omitted).  For the reasons detailed below, the SJC rulings were not based on an unreasonable determination of the facts.  Nor are they contrary to nor an unreasonable application of Supreme Court law.

Additional facts will be included herein as necessary.

### III.   STANDARD FOR HABEAS REVIEW

The standard of review to be applied to Camacho's habeas corpus petition is set forth in

28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA").  That standard provides that a writ of habeas corpus should not be granted on any

claim that was adjudicated by the state court on the merits unless the adjudication "(1) resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly establ-

ished Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d).  "AEDPA's strict standard of

review only applies to a claim that was adjudicated on the merits in state court proceedings."

Norton v. Spencer, 351 F.3d 1, 5 (1st Cir. 2003), cert. denied, 542 U.S. 933, 124 S. Ct. 2876, 159

L. Ed. 2d 798 (2004) (internal citations and quotations omitted).  "If a claim was not adjudicated

on the merits in a state court proceeding, then the issue is reviewed de novo."  Id.  In addition

to meeting one of AEDPA's prongs, "[t]he petitioner must also show that the state court's error

had a 'substantial and injurious effect' on the jury's verdict."  Lucien v. Spencer, 871 F.3d 117,

122 (1st Cir. 2017) (citation omitted).

A writ of habeas corpus is only appropriate "under the 'contrary to' clause if the state

court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it

decides a case differently than [the Supreme Court has] done on a set of materially indistin-

guishable facts."  Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914

(2002); see also Linton v. Saba, 812 F.3d 112, 122 (1st Cir. 2016).  When reviewing a merits

decision based on the allegation that a ruling was contrary to established federal law, "a habeas

court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Wetzel v. Lambert, 565 U.S. 520, 524, 132 S. Ct. 1195, 1198, 182 L. Ed. 2d 35 (2012) (quoting Harrington v. Richter, 562 U.S. 86, 102, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011)).  Moreover, "[i]n this context, 'clearly established law' signifies 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" Howes v. Fields, 565 U.S. 499, 505, 132 S. Ct. 1181, 1187, 182 L. Ed. 2d 17 (2012) (quoting Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000)).  In addition, "clearly established federal law" refers to law existing at the time of the state-court decision. White v. Woodall, 572 U.S. 415, 426, 134 S. Ct. 1697, 1706, 188 L. Ed. 2d 698 (2014).

A habeas court is bound by existing Supreme Court law and cannot extend such law in granting relief.  "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law." Id. (internal citations and quotations omitted).

"[A] state court adjudication constitutes an unreasonable application of clearly established federal law if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case." Tran v. Roden, 847 F.3d 44, 48 (1st Cir. 2017) (internal quotation marks, punctuation and citation omitted).  An unreasonable application must entail more than "some

increment of incorrectness beyond error[.]" McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc) (citation omitted); accord Bell v. Cone, 535 U.S. at 694, 122 S. Ct. at 1850.  The "increment of incorrectness beyond error" "must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court."  Brown v. Ruane, 630 F.3d 62, 67 (1st Cir. 2011) (quoting McCambridge, 303 F.3d at 36).  Moreover, under this analysis, "a state court is afforded deference and latitude."  Hensley v. Roden, 755 F.3d 724, 731 (1st Cir. 2014), cert denied, 135 S. Ct. 964, 190 L. Ed. 2d 852.

Finally, as mandated by 28 U.S.C. § 2254(e)(1), the "state court's factual findings are presumed to be correct unless the petitioner rebuts the presumption with clear and convincing evidence."  Companonio v. O'Brien, 672 F.3d 101, 109 (1st Cir. 2012), cert denied, 568 U.S. 857, 133 S. Ct. 197, 184 L. Ed. 2d 101.  This "presumption of correctness applies to factual determinations made by both state trial and appellate courts."  Id. (citing Clements v. Clarke, 592 F.3d 45, 47 (1st Cir. 2010)).

## IV.   DISCUSSION

### A.   Gang Related Discovery

Camacho argues that the prosecution wrongfully withheld discovery related to the fact that the victim and his friends were members of the Bloods.  He argues further that the absence of this information deprived him of a fair trial because it could have bolstered his defense and been used to impeach witnesses against him.  According to Camacho, his rights were further violated because the absence of this evidence led the trial judge to exclude

evidence about the violent past of the victim and his friends[7] and otherwise deprived the jury of

a fair picture of the shooting.  See generally Mem. in Supp. of Pet. (Docket No. 20) at 2, 11-24.

As detailed above, in claiming that the Commonwealth actually withheld gang related evidence,

Camacho relies on two pieces of information, (1) a statement by the prosecutor at the hearing

on the motion for a new trial, and (2) a report from the Department of Correction that includes

a summary of the crime.  The SJC ruled that neither the prosecutor's statement, nor the report

actually "demonstrated sufficiently that postconviction discovery would have led to additional

evidence warranting a new trial."  Camacho, 472 Mass. at 601, 36 N.E.3d at 546.  There is no

basis to disturb this ruling on habeas review.

It is Camacho's contention that the SJC's (and trial judge's) conclusion that the prosecu-

tor did not admit that Rodriguez's friends were members of the Bloods "was a patently

unreasonable determination of the facts in light of the evidence presented."  Pet. Reply (Docket

No. 26) at 2.  This court disagrees.  The ADA made a statement during the new trial hearing that

he "believed" that "Rodriguez and his friends were more affiliated with the Bloods."  Camacho,

472 Mass. at 599 n.15, 36 N.E.3d at 545 n.15.  This is consistent with Sunsin's trial testimony

that "[t]he closest thing to a Blood there was probably Gaby [Rodriguez]."  RA II at 744.  It is

also consistent with Miranda's testimony at trial that he and Camacho were members of the

TRG gang, id. at 694, and that Rodriguez was associated with the Bloods.  Id. at 715 ("I believe

my problem with Gaby was that he was associated with the Bloods . . . .  If he was not a Blood

---

[7] In his appeal to the SJC, Camacho challenged the trial judge's exclusion of this evidence.  Camacho, 472 Mass. at 591-96, 36 N.E.3d at 538-42.  He has not renewed his objection to that ruling in his habeas petition.

himself he was definitely associated with them.").  Moreover, in his comments to the court, the prosecutor distinguished between "members" of TRG and the others who "were more affiliated with the Bloods" — he did not call the latter "members" of the Bloods.  The SJC was not unreasonable in finding that the ADA's "statement that Rodriguez's friends were 'more affiliated with the Bloods' is not evidence that the victim was in fact in a rival gang, but only suggests that the victim was 'more affiliated' with Rodriguez than he was with the defendant's gang."  Camacho, 472 Mass. at 600, 36 N.E.3d at 545.

Similarly, there is no basis to disturb the finding of the state court that the DOC document did not establish that the Commonwealth knew and withheld evidence that the victim was a member of the Bloods.  As noted above, Camacho relies on a summary of the shooting from a DOC report which provided that "[a] verbal altercation began between friends of [the defendant] and a group of men affiliated with a rival gang.  This rival group included the deceased victim . . . ."  Camacho, 472 Mass. at 599 n.16, 36 N.E.3d at 545 n.16.  Camacho argues that through this report, "the Commonwealth reiterated that Santiago's entire group was gang-affiliated[.]"  Mem. in Supp. of Pet. at 14.

As an initial matter, this document was not intended to formally report the identity of gang members.  Rather, it is an informal description of the events surrounding Camacho's conviction and the language used was not necessarily precise as to the victim's relationship to a group adverse to Camacho.  More importantly, there is no basis to disturb the SJC ruling that "the Department of Correction report cannot be attributed to the prosecutor" and that, even assuming gang-related evidence existed, "the Commonwealth was not obligated to search other law enforcement agencies for it."  Camacho, 472 Mass. at 600, 36 N.E.3d at 545.  In view

[19]

of the facts presented here, this ruling is consistent with Supreme Court law.  Under Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d 215 (1963), and its progeny, "the prosecution's failure to disclose favorable information to the defense constitutes a violation of the defendant's constitutional rights" if "it deprives the defendant of a fundamentally fair trial." Mastracchio v. Vose, 274 F.3d 590, 601 (1st Cir. 2001) (citing United States v. Bagley, 473 U.S. 667, 678, 105 S. Ct. 3375, 3381, 87 L. Ed. 2d 481 (1985), and Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972)).  In Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490 (1995), the Supreme Court held that in upholding its obligation under Brady, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." However, "[w]hile a prosecutor must disclose information maintained by government agents even if the prosecutor herself does not possess the information . . . this duty does not extend to information possessed by government agents not working with the prosecution."  United States v. Hall, 434 F.3d 42, 55 (1st Cir. 2006) (internal citations omitted).  Thus, even assuming that the DOC report contained factual information and not just hearsay, Camacho has not established that the prosecutor had a duty to obtain or disclose information in the DOC's possession since there is no evidence that the DOC was involved in prosecuting Camacho's case.  The SJC therefore did not err in holding that the report could not be attributed to the prosecutor and that the Commonwealth was not obligated to search other law enforcement agencies for evidence of gang membership.  The SJC's decision was not unreasonable and was not contrary to Supreme Court law.

[20]

In the absence of evidence of actual gang affiliation, there is no need to reach the SJC's further conclusions that even if evidence of the others' gang affiliation did exist, "the defendant has failed to show that it would have materially aided his defense or factored into the jury's deliberations" or that it was "unlikely that any evidence of gang affiliation would have provided substantial impeachment value (e.g., to demonstrate witness bias)."  If those issues are reached, however, the record compels the conclusion that the rulings are not clearly erroneous, nor are they contrary to or an unreasonable application of Supreme Court law.  Camacho, 472 Mass. at 601, 36 N.E.3d at 546.  Under Supreme Court law, a defendant's constitutional rights are violated by the prosecution's failure to disclose favorable information "only if it deprives the defendant of a fair trial."  Bagley, 473 U.S. at 678, 105 S. Ct. at 3381.  Here, the ill feelings between the two groups was fully explored at trial.  The fact that Rodriguez started the fight and that the defendant contended that he needed to defend his friend Sunsin were theories presented to the jury.  As the SJC recognized, since Camacho had not demonstrated that he had actual knowledge that anyone in the victim's group apart from Rodriguez was affiliated with a gang, Camacho could not have argued that he acted as he did in response to his opponents' gang affiliation.  Camacho, 472 Mass. at 601, 36 N.E.3d at 546.  Similarly, there is no basis to disturb the SJC's conclusion that the information had no impeachment value since the witnesses "more affiliated" with the Bloods were not questioned about their gang membership. Id.  Camacho contends that "Santiago's companions did effectively deny any association with the Bloods, contrary to the SJC's determination."  Mem. in Supp. of Pet. at 16.  Nowhere in Camacho's citations to the record, however, were any of the witnesses asked, nor did they

testify about, whether they belonged to the Bloods.  See RA II at 599-602, 637-40, 661, 613-15, 602-08, 619-21, 651, 671-72.

Finally, Camacho's argument that the jury may have viewed the evidence differently if it knew that the melee was begun by an attack by a rival gang "and not a loner with a bottle" is not persuasive.  See Pet. Reply at 4.  The fact that there was a melee among opposing groups of friends was clearly presented.  Moreover, as the SJC found, "there is simply no credible evidence that the victim was involved in any of the events that unfolded between the time when Rodriguez threw the bottle and the defendant fired his weapon."  Camacho, 472 Mass. at 595, 36 N.E.2d at 541.  As the SJC explained, the surveillance footage established that the victim was not with either group during the skirmish, and he did not play any role in the brawl or pose any threat to the defendant or his group.  Id.  Rather, the evidence was that the victim was shot the first time, and fell, while attempting to flee the gunfire.  Id.[8]  Thus, there is ample support for the SJC's conclusion that evidence of the victim's gang affiliation, if it existed, would not have impacted the jury's view of the other evidence.  The SJC's conclusion that the failure to disclose the alleged gang affiliation of the victim did not deprive the defendant of a fair trial is amply supported by the record.

**B.    Ineffective Assistance of Counsel**

Camacho argues next that his counsel was ineffective in failing to review crucial evidence in a timely manner.  Specifically, he argues that his attorney, Willie Davis, did not review a video of the Commonwealth's key witness, Mr. Diaz, from the night of the shooting until the

---

[8] The SJC addressed these facts in connection with its ruling that the trial judge had properly excluded evidence of the past violent crimes of the victim and his friends.

night before Mr. Diaz testified, and that Attorney Davis failed to meaningfully review

surveillance footage from the club such that he could anticipate the use of that video in the

Commonwealth's closing argument.  Camacho argues that as a result of this failure, Attorney

Davis was ineffective in not advising him to take a plea to second degree murder while the

government was still offering that deal.  That offer was available until after Mr. Diaz testified.

Both the trial judge and the SJC held that Attorney Davis was not ineffective.[9]  For the reasons

addressed herein, the SJC's decision was not an unreasonable determination, nor was it

contrary to established Supreme Court law.

<u>Standard for Ineffective Assistance of Counsel Claims</u>

The SJC correctly identified the standard for claims of ineffective assistance of counsel,

which the Supreme Court established in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052,

80 L. Ed. 2d 674 (1984).  The Court held in <u>Strickland</u> that to establish a claim of ineffective

assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel was
> not functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment.  Second, the defendant must show that the deficient perfor-
> mance prejudiced the defense.  This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it cannot be
> said that the conviction ... resulted from a breakdown in the adversary
> process that renders the result unreliable.

---

[9] As the SJC recognized, the findings of the trial judge, who also heard the motion for a new trial, "are entitled to substantial deference," since he had the opportunity to observe counsel's effectiveness first hand.  <u>Camacho</u>, 472 Mass. at 605 n.23, 36 N.E.3d at 549 n.3 (internal quotation omitted).  This is consistent with federal law.  <u>See</u> <u>White v. Wheeler</u>, 136 S. Ct. 456, 460, 193 L. Ed. 2d 384 (2015).

Id. at 687, 104 S. Ct. at 2064.  Under the first prong of Strickland, "there is a strong presumption that counsel's strategy and tactics fall within the range of reasonable professional assistance, and courts should avoid second-guessing counsel's performance with the use of hindsight." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065) (internal quotations omitted).  "It is only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it, that the ineffective assistance prong is satisfied."  Id. (internal quotations omitted). "Performance is measured against an objective standard of reasonableness, and it is constitutionally deficient only if no competent attorney would have acted as counsel did." Companonio, 672 F.3d at 110 (internal quotations, citations, and punctuation omitted).

As an initial matter, and as described above, this court notes that the prosecutor, himself, believed that a manslaughter verdict was possible even knowing all the evidence.  See RA II at 512, 514, 517-18.  Moreover, as the trial judge found, the prosecutor's demand for a plea of second degree murder was premised on the belief that Diaz would testify.  SA 20.  Thus, when it appeared that Diaz would not be available to testify, it would not have been unreasonable for Attorney Davis to continue to push for a plea to manslaughter and to advise his client not to take a second degree plea.

The prosecutor, himself, did not become convinced that a first degree murder conviction was likely until after Diaz testified in person.  By then, the option of a plea to second degree was off the table.  The trial judge, himself, found it "understandable" for Attorney Davis not to have realized that his defense was in trouble until the prosecutor's "powerfully persuasive" closing argument.  SA 21-22.  Other than his personal belief to the contrary, the defendant

[24]

has not established that the state court's factual findings were clearly erroneous,[10] or that the state court's decision was contrary to or an unreasonable application of Supreme Court law.

Camacho argues that the SJC's holding was an unreasonable application of the federal law clearly established by Hill v. Lockhart, 474 U.S. 52, 106 S. Ct. 366, 88 L.Ed.2d 203 (1985), and Lafler v. Cooper, 566 U.S. 156, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012). Mem. in Supp. of Pet. at 35. Camacho's argument is not persuasive. The SJC applied the appropriate standard and the facts of Camacho are such that the SJC's ruling in Camacho cannot be said to be contrary to or an unreasonable application of Supreme Court law.

In Hill, the defendant agreed to accept a plea offer based on counsel's erroneous representation that he would only be required to serve one-third of the sentence before being eligible for parole, not the one-half that Arkansas required of second offenders. The Supreme Court held that the two-pronged test of Strickland applies to a defendant's challenge to counsel's advice in plea negotiations. Hill, 474 U.S. at 58, 106 S. Ct. at 370. Thus, the defendant must prove (1) "that counsel's representation fell below an objective standard of reasonable-ness" and (2) that the defendant was prejudiced thereby. Id. at 57-58, 106 S. Ct. at 370 (internal quotation omitted). The Hill court ruled that the "prejudice" requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Id. at 59, 106 S. Ct. at 370. As the Supreme Court explained further in Lafler, to prove

---

[10] The defendant disagrees with the SJC's factual findings that the belated review of Diaz's video statement was mitigated by his review of the grand jury testimony, that an earlier review would not have altered his trial strategy, and that it was reasonable for Attorney Davis to have failed to understand the significance of the surveillance video. Mem. in Supp. of Pet. at 29-30, 27. However, he offers no facts to support his claim that these findings were clearly erroneous.

prejudice "[i]n the context of pleas[,] a defendant must show the outcome of the plea process would have been different with competent advice."  Lafler, 566 U.S. at 163, 132 S. Ct. at 1384. In Lafler, as in the instant case, the "ineffective advice" resulted in the rejection of a plea offer, and the prejudice claimed was "[h]aving to stand trial, not choosing to waive it[.]"  Id. at 163-64, 132 S. Ct. at 1385.  As the Court held:

> In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Id. at 163, 132 S. Ct. at 1385.

Camacho argues that he met his burden of proving prejudice, since it is likely that he would have pled guilty to second degree murder if his counsel had recommended it, the plea offer remained open until Diaz took the stand, there was no reason to believe that the trial judge would not have accepted the plea, and the sentence Camacho received was more severe than the plea proposal.  Mem. in Supp. of Pet. at 32-35.  This court agrees that there is ample evidence that Camacho would have (and did, in fact) follow counsel's advice in connection with the decision whether to plead, and that it is likely that the other elements of the prejudice analysis would have been met.  Habeas relief, nevertheless, is not available where, as here, the first prong of the Strickland test is not met.  Both Hill and Lafler held that the first prong of Strickland, i.e., a finding that counsel's performance fell below an objective standard of reasonableness, must be met.  Hill, 474 U.S. at 62, 106 S. Ct. at 372; Lafler, 566 U.S. at 163, 132 S. Ct. at 1384.  However, in neither case did the Court need to reach that issue.

[26]

In <u>Hill</u>, the Court found "it unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel" since Hill failed to allege that "he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty" and therefore failed to establish prejudice.  <u>Hill</u>, 474 U.S. at 60, 106 S. Ct. at 371.  In <u>Lafler</u>, counsel's advice that the defendant "could not be convicted for assault with intent to murder as a matter of law because the shots hit [the victim] below the waist" was stipulated by the parties to be deficient performance.  <u>Lafler</u>, 566 U.S. at 174, 132 S. Ct. at 1390-91.  Notably, however, the Supreme Court in <u>Lafler</u> expressly recognized in endorsing the parties' stipulation that "an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance."  <u>Id.</u> at 174, 132 S. Ct. at 1391.

The SJC's determination in the instant case that Attorney Davis's erroneous prediction did not constitute ineffective assistance of counsel is not contrary to nor an unreasonable application of Supreme Court law.  See <u>Parsley v. U.S.</u>, 604 F.3d 667, 672 (1st Cir. 2010) ("The district court correctly followed the law in concluding that counsel had made a reasonable strategic choice in counseling his client."); <u>see also</u> <u>Brown v. Medeiros</u>, Civil No. 18-10181-LTS, 2018 WL 3589080, at *7 (D. Mass. July 26, 2018) (acknowledging that "the Supreme Court has explicitly declined 'to elaborate or define detailed standards for the proper discharge of defense counsel's' responsibilities in the plea bargaining process, recognizing that 'alternative courses and tactics in negotiation are so individual that it may be neither prudent nor practicable' to establish such standards." (citing <u>Missouri v. Frye</u>, 566 U.S. 134, 145, 132 S. Ct. 1399, 1408 (2012))).  The prosecutor agreed that manslaughter was a possible verdict and the

trial judge did not find defense counsel's performance inadequate.  The court's findings that counsel's choice was <u>not</u> "so patently unreasonable that no competent attorney would have made it" is amply supported by the record.  <u>Knight</u>, 447 F.3d at 15 (internal quotation omitted).

"When a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel during plea bargaining, [Supreme Court] cases require that the federal court use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt."  <u>Burt v. Titlow</u>, 571 U.S. 12, 15, 134 S. Ct. 10, 13, 187 L. Ed. 2d 348 (2013) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 190, 131 S. Ct. 1388, 1403, 179 L. Ed. 2d 557 (2011)).  Camacho has not met this high burden.

## V.   <u>CONCLUSION</u>

For the reasons stated herein, this court recommends to the District Court assigned to this case that Camacho's petition for a writ of habeas corpus be denied.[11]

/ s / Judith Gail Dein          
Judith Gail Dein
United States Magistrate Judge

---

[11] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days after being served with this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which the objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  <u>See</u> <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275 (1st Cir. 1988); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 604-05 (1st Cir. 1980); <u>United States v. Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir. 1983); <u>see also</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). <u>Accord</u> <u>Phinney v. Wentworth Douglas Hosp.</u>, 199 F.3d 1, 3-4 (1st Cir. 1999); <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143, 150-51 (1st Cir. 1994); <u>Santiago v. Canon U.S.A., Inc.</u>, 138 F.3d 1, 4 (1st Cir. 1998).